## DUPLEX METALS CO. v. STANDARD UNDERGROUND CABLE CO.

(District Court, W. D. Pennsylvania.   November 23, 1914.)

No. 66.

TRADE-MARKS AND TRADE-NAMES ☞3—UNFAIR COMPETITION—USE OF DESCRIPTIVE TERMS.

A complainant *held* to have acquired no exclusive right to the use of the term "copper-clad" as applied to iron or steel wire coated with copper which would support a suit to enjoin its use by another as unfair competition; it appearing that the term, besides being in itself descriptive, was so used by complainant.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 4–7; Dec. Dig. ☞3.]

In Equity.   Suit by the Duplex Metals Company against the Standard Underground Cable Company.   On final hearing.   Decree for defendant.

See, also, 218 Fed. 269.

Philipp, Sawyer, Rice & Kennedy, of New York City, and Reed, Smith, Shaw & Beal, of Pittsburgh, Pa., for complainant.

Christy & Christy, of Pittsburgh, Pa., for defendant.

ORR, District Judge.   This suit in equity has come to final hearing upon bill, answer, replication, and proofs completed prior to the adoption of the present equity rules.   The bill asserts the title to certain letters patent of the United States No. 893,932, issued to plaintiff as assignee of John F. Monnot, for "improvements in copper-clad iron

and steel," and charges the defendant with infringement of that patent. It further asserts the right of the plaintiff to the exclusive use of the word "copper-clad" in connection with the steel wire having a covering of copper sold by the defendant in competition with steel wire having a covering of copper sold by plaintiff, and charges that the defendant was guilty of unfair competition in trade, in that the defendant has used the word "copper-clad" as descriptive of the wire sold by the defendant, in that it has used also in advertising its products a representation of a disc of a very large diameter relatively to the wire, in which disc the plaintiff alleges that it has exclusive rights, and in that the defendant has used a picture of the Singer Building in the city of New York, which was viewed by the public as the home of the plaintiff, and with intent on the part of the defendant to deceive the public, and also in that the defendant has paralleled the advertisements of the plaintiff.

The proceedings, so far as they charge infringement of the patent, were brought to a close on June 25, 1913, by the entry of a decree dismissing the bill of complaint as to that issue. This dismissal was had at the instance of the plaintiff, because after plaintiff's prima facie case was made out the plaintiff had ascertained, and the rebuttal testimony of its expert on cross-examination showed, that the defendant's wire was so made that it could not be viewed as an infringement of the patent.

There remained in the case, therefore, the one question as to whether in any of the ways charged in the bill the defendant was guilty of unfair competition. The main contention is that the phrase "copper-clad" was coined by the plaintiff and adopted by it as a fanciful and arbitrary designation for its wire, that the said phrase has been understood by the public as indicating and meaning the plaintiff's wire, and that because the defendant uses the phrase "copper-clad" the public are liable to be and have been deceived.

Before considering whether or not the phrase is an essentially descriptive term, we shall consider whether or not the plaintiff intended that the phrase should be a descriptive one. In the very patent which was for so long the principal object of the litigation, and upon the face of which it appears the plaintiff was the assignee, is this statement by the inventor:

"My invention relates to a process of making clad metals, by which term is meant bodies comprising a core or base of one metal (iron or steel for instance) having united thereto, and preferably inseparably united or welded thereto, a substantial layer or coating of metal, usually an unlike metal (for instance, copper, silver, gold, aluminum, brass, bronze, aluminum bronze, etc.). In particular my invention comprises a process of making clad metal ingots which ingots, when formed, may be rolled, pressed, hammered, or otherwise extended down to rods, sheets, bars, strips, wire, and other commercial or desired forms."

The claims are numerous, and each, except the twenty-first and twenty-third, are for a process of forming clad-metal objects. Other patents by the same inventor and assigned to the plaintiff, to wit, United States patent No. 927,372, and United States patent No. 929,687, relate to the clad metals as stated in each. There is no suggestion in

any of the patents that the word "clad" is used in a different sense from coated or covered. Monnot's earlier patent, being United States patent No. 853,716, issued May 13, 1907, "for a process of producing compound metal bodies," does not use the word "clad," but uses the words "coating" and "coated" as descriptive. That the word "clad," where used in Monnot's patents, was intended to be descriptive, must be the conclusion. Otherwise, we have the situation of an inventor having secured to himself by his patent the process or the product for the limited period provided by law, and further securing to himself the right to the descriptive appellation given by him in his patent to the product for all time to come, after the expiration of the patent. The rights of the public in and to the product or process after the expiration of the patent, therefore, would be exceedingly limited, if the public could not use the descriptive terms used by the inventor in his application and by the government in the patent granted in pursuance thereof.

Again, the evidence discloses that in the early history of the plaintiff company it called its wire product "Monnot's copper-clad wire"; the plaintiff described its product generally as "Monnot metals"; it had several cuts which it used in connection with its products as trademarks, and in none of them does the word "copper-clad" appear. In a pamphlet issued in February, 1910, entitled "Standard Specifications for Hard Drawn Copper-Clad Steel Wire," the plaintiff uses this language:

"(b) Copper-clad steel is manufactured under the trade-mark 'weld-clad,' and each coil of wire shall have attached to it a tag bearing this name and a cut of a billet section."

The foregoing are but brief allusions to a large mass of evidence which constrain the court to hold that plaintiff's use of the phrase "copper-clad" was for purposes of description. From this description the person unacquainted with plaintiff's product would form an opinion that the product of the plaintiff was a wire composed of steel or iron or some other metal having thereon a coat of copper. As a matter of fact both plaintiff and defendant are manufacturing wire of steel clothed or clad with copper.

Apart from the plaintiff's intention to use the phrase as descriptive of its product, the phrase itself is essentially descriptive. The diligence of counsel for the defendant has produced numerous examples of the use of the words "clothed" and "clad" as descriptive terms from the best examples of poetry and prose in the English language. Various compounds of "clad" occur to the mind, all of which are descriptive. In the patent law compounds of clad are found, as, for instance, steel-clad in the case of Steel-Clad Bath Co. v. Mayor (C. C.) 77 Fed. 736; in connection with shoes, as in Brennan v. Bird-Thayer Dry-Goods Co. (C. C.) 99 Fed. 971, 975. It is found in connection with fibre in United States patent to T. Gore, No. 922,418, for "fibre-clad wire rope."

The phrase, then, not only having been used by plaintiff as descriptive, but being in its nature essentially so, the plaintiff cannot have any exclusive right therein. The law on the subject is fully stated by

Justice McKenna in Standard Paint Co. v. Trinidad Asphalt Co., 220 U. S. 446–452, et seq., 31 Sup. Ct. 456, 457 (55 L. Ed. 536):

"Two contentions are made by the paint company: (1) That its trademark is a valid one and has been infringed by the asphalt company; (2) that the latter has been guilty of unfair competition. The Court of Appeals decided adversely to both contentions. 163 Fed. 977 [90 C. C. A. 195]. Of the first contention the court said it was clear that the paint company 'sought to appropriate the exclusive use of 'the term "rubberoid," ' and that its rights were to be adjudged accordingly, and that as the latter, being a common descriptive word, could not be appropriated as a trade-mark, the one selected by the paint company could not be appropriated. The court said: 'A public right in rubberoid and a private monopoly of rubberoid cannot coexist.' The court expressed the determined and settled rule to be: 'That no one can appropriate as a trade-mark a generic name or one descriptive of an article of trade, its qualities, ingredients, or characteristics, or any sign, word, or symbol which from the nature of the fact it is used to signify others may employ with equal truth.' For this cases were cited and many illustrations were given which we need not repeat. The definition of a trade-mark has been given by this court and the extent of its use described. It was said by the Chief Justice, speaking for the court, that 'the term has been in use from a very early date, and, generally speaking, means a distinctive mark of authenticity, through which the products of particular manufacturers or the vendable commodities of particular merchants may be distinguished from those of others. It may consist in any symbol or in any form of words, but as its office is to point out distinctively the origin or ownership of articles to which it is affixed, it follows that no sign or form of words can be appropriated as a valid trade-mark, which, from the nature of the fact conveyed by its primary meaning, others may employ with equal truth, and with equal right, for the same purposes.' Elgin National Watch Co. v. Illinois Watch Co., 179 U. S. 665–673 [21 Sup. Ct. 270, 45 L. Ed. 365]. There is no doubt therefore, of the rule. There is something more of precision given to it in Canal Co. v. Clark, 13 Wall. 311–323 [20 L. Ed. 581], where it it said that the essence of the wrong for the violation of a trade-mark 'consists in the sale of the goods of one manufacturer or vendor as those of another, and that it is only when this false representation is directly or indirectly made that the party who appeals to a court of equity can have relief.' A trade-mark, it was hence concluded, 'must therefore be distinctive in its original signification, pointing to the origin of, the article, or it must have become such by association.' But two qualifying rules were expressed, as follows: 'No one can claim protection for the exclusive use of a trade-mark or trade-name which would practically give him a monopoly in the sale of any goods other than those produced or made by himself. If he could, the public would be injured rather than protected, for competition would be destroyed. Nor can a generic name or a name merely descriptive of an article of trade, of its qualities, ingredients, or characteristics, be employed as a trade-mark, and the exclusive use of it be entitled to legal protection,' and, citing Amoskeag Mfg. Co. v. Spear, 4 N. Y. Super. Ct. 599, it was further said that there can be 'no right to the exclusive use of any words, letters, figures or symbols which have no relation to the origin or ownership of the goods, but are only meant to indicate their names or qualities.' "

There is nothing in the phrase "copper-clad wire" which has any relation to the origin or ownership of the wire manufactured by the plaintiff. To so hold would give the plaintiff a monopoly which he might have had by his patent if the defendant were an infringer and this the court cannot grant under the evidence in this case.

The defendant is a large producer of wire. The copper-clad wire, which it sells to the public, defendant draws from rods or small billets which have been clad with copper by the Colonial Steel Company, a

corporation which is operating under patents owned by it. The defendant sells its wire as Colonial copper-clad wire. It ships its wire to users as Colonial copper-clad wire from Standard Underground Cable Company. So far as appears, it has not and does not sell any copper-clad wire without indicating that it is the Colonial copper-clad wire, or with any omission or suggestion which would lead the public to believe that it was copper-clad wire made by the Duplex Metals Company the plaintiff. So far, therefore, as the defendant sells copper-clad wire, it is guilty in no way of unfair competition against the defendant, unless the phrase "copper-clad" has acquired a secondary meaning. Plaintiff's patents above cited negative that contention, because the claim of monopoly under the patents destroys the presumption of acquiescence through which the right to the secondary meaning of the phrase could only arise.

In respect to the use by the defendant of the disc complained of in the bill, the conclusion must be reached that the disc is descriptive merely. True, it is not drawn to scale to show the relative thickness of the steel and the copper; nevertheless it appears to be a cross-section of copper-clad wire. No other conclusion can be reached from the evidence than that it is an informative illustration, and intended as such. It was not copied from any design of the plaintiff, or intended to suggest any relation of defendant's with plaintiff's product. The illustration of the Singer Building used by defendant in some advertising matter was not used by defendant in connection with any advertising of copper-clad wire. It was used to advertise the fact that defendant had furnished wire of another quality in the completion of that building. That building during its erection attracted the curious. The representation of it by the defendant is totally unlike that used by the plaintiff. It antedates that of the plaintiff as well.

With respect to the charge that defendant has paralleled and is paralleling the advertisements of the plaintiff, the conclusion must be reached that the contention of the plaintiff has not been sustained by the proofs. In every view of the case, the court fails to find any fraud actual or intended. Without this plaintiff has no standing.

The bill must therefore be dismissed, at plaintiff's costs. Let a decree be drawn.